TINSLEY v. ETOWAH POWER CO. et al.

(District Court, N. D. Georgia.   April 22, 1912.)

No. 1,246.

1. WATERS AND WATER COURSES (§ 156*)—CONVEYANCE OF RIGHTS—SUFFICIENCY.

An instrument, giving the right of flowage over a tract of land by a dam, which recites the payment of $1, and an agreement to pay $24 additional when work on the dam should be commenced, is a conveyance and not an option.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. §§ 158, 174–183; Dec. Dig. § 156.*]

2. WATERS AND WATER COURSES (§ 156*)—CONVEYANCE—CONSIDERATION.

A conveyance of a right of flowage, reciting the payment of $1 as consideration, is supported by a sufficient consideration whether the sum named was actually paid or not.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. §§ 158, 174–183; Dec. Dig. § 156.*]

3. RECEIVERS (§ 99*)—PURCHASE OF PROPERTY—VALIDITY.

A conveyance by the owner of land of a right of flowage to the receiver for a corporation, for which he was paid a small sum, is valid to devest the grantor of such right, although the receiver had not previously obtained authority from the court to make the purchase.

[Ed. Note.—For other cases, see Receivers, Cent. Dig. §§ 183–186; Dec. Dig. § 99.*]

4. VENDOR AND PURCHASER (§ 228*)—VALIDITY OF CONVEYANCE—SUBSEQUENT PURCHASER WITH NOTICE.

Whether a conveyance of an easement was so executed as to render its record constructive notice is immaterial to affect its validity as against a subsequent grantee from the same grantor who had actual notice.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 495–501; Dec. Dig. § 228.*]

In Equity.   Suit by T. G. Tinsley against the Etowah Power Company and Zephaniah Abernathy.   Decree for defendants.

John T. Norris, of Cartersville, Ga., and King & Spalding, of Atlanta, Ga., for complainant.

Paul F. Akin and J. M. Neel, both of Cartersville, Ga., H. H. Dean, of Gainesville, Ga., and Robt. C. & Philip H. Alston, of Atlanta, Ga., for defendants.

NEWMAN, District Judge.   This bill is brought by the complainant against the defendant company, complainant asking to have a decree in his favor finding that he has full, complete, and perfect title to land lot No. 424 in the twenty-first district and second section of Bartow county, Ga., together with all water rights, powers, and privileges ap-

pertaining thereto and all rights, privileges, and appurtenances in any way connected therewith, and for the cancellation of certain deeds to said land lot and the privileges and appurtenances, water power, and otherwise as a cloud upon complainant's title, and that a deed from Zephaniah Abernathy to A. O. Granger, as receiver of the Etowah Iron Company, be decreed to be of no effect as against complainant, and that it be as to him and all persons claiming under him null and void, and that the same be canceled as constituting a cloud upon complainant's title. Georgia Power Company has been made a party by amendment.

It appears that on the 17th day of November, 1899, Zephaniah Abernathy was the owner in fee simple of a certain lot of land No. 424 in the twenty-first district and second section of Bartow county, Ga., and that on that date he delivered the following instrument:

Georgia, Bartow County.

### Z. Abernathy to A. O. Granger.

In consideration of one (1) dollar cash paid by A. O. Granger as receiver of Etowah Iron Company and of twenty-four (24) dollars to be paid me as soon as the property of Etowah Iron Company is sold by the receiver, or the privileges, rights and estates hereinafter conveyed shall be used by said receiver or his assigns I, Zephaniah Abernathy of said county do hereby sell and convey to said A. O. Granger as receiver of the property of Etowah Iron Company and his successors and assigns the following rights, privileges, easements and estates in lot of land No. 424 in twenty-first (21st) District and second (2nd) section of Bartow county, Georgia, to wit: The sole and exclusive right and privilege of erecting upon said lot or elsewhere upon the Etowah river such dam or dams and waterways and other obstructions to the flow of said Etowah river as said Granger, as receiver as aforesaid, and his successors and assigns may desire so as to utilize the water power of said river in any way desired by said Granger, as receiver as aforesaid, his successors and assigns; and also the right and privilege to back and flow or pond water upon any portion of said lot by means of any dams and other obstruction to the flow of said river in any way; so that said Granger as receiver as aforesaid, his successors and assigns, shall have the full and sole privilege of using said lot of land in any way they may desire for the purpose of utilizing the water power of the Etowah river on any of the properties now or hereafter belonging to said Etowah Iron Company or said Granger as receiver as aforesaid, his or their successors or assigns.

To Have and to Hold said bargained premises and the rights, privileges, easements and estates forever in fee simple with full warranty of title.

Witness my hand and seal this 17 day of November, 1899.

his<br>
Zehanio  X  Abernathy.<br>
mark

Signed, sealed and delivered in presence of:

    M. E. Calhoun.

    G. W. Hendricks, Ordinary Bartow Co., Ga.

Recorded Jan. 8, 1900.  JJ—498.

This paper appears on its face to have been properly attested, and an entry on it shows that it was recorded on the proper book of record at the office of the clerk of the superior court of Bartow county on January 8, 1900.

There is a contest in this case as to whether the attestation of this paper was such as to admit it to record, and therefore whether its record was constructive notice to the world of its execution and existence.

It is unnecessary to stop here to discuss this question, as it is probably immaterial in the view taken of the case.

On January 25, 1902, Abernathy conveyed to Albert Strickland the exclusive right of flooding the lot in controversy with dams or erecting dams thereon for the cash consideration of $25 then paid to him. It seems that prior to the transaction with Granger, receiver, and Strickland, the land lot in controversy had been set apart to Zephaniah Abernathy as a homestead to the Abernathy family, consisting of his wife and minor children. It appears that in view of this on May 19, 1905, Abernathy for the consideration of $1 and love and affection conveyed said lot to his wife, Josephine, supposed then to be apparently the surviving beneficiary of the homestead. She on May 20, 1905, conveyed to T. G. Tinsley. It was ascertained that one of the minor children still lacked a few months of being 21 years of age, and he made a lease to Strickland for $5 a month, which apparently lasted until he became of age.

This statement with reference to the homestead is made as a part of the history of the case and does not cut any figure in the matter for consideration now.

For convenience the various conveyances by the parties, respectively, the following chain of title as to each, commencing with Zephaniah Abernathy as the common grantor, as follows:

Zephaniah Abernathy, Common Grantor.

Plaintiff's Title.

(1) Abernathy to Albert Strickland, January 25, 1902.
(2) Zephaniah Abernathy to Josie Abernathy, May 19, 1905.
(3) Josie Abernathy to Albert Strickland, May 20, 1905.
(4) Albert Strickland to T. G. Tinsley, May 20, 1905.

Defendants' Title.

(1) Abernathy to Granger, receiver Etowah Iron Company, November 17, 1899.

(2) Etowah Iron Company to Blue Ridge Mining Company, September 14, 1900.

(3) Blue Ridge Mining Company to City Trust Company, mortgagee, September 20, 1900.

(4) City Trust Company to Blue Ridge Mining Company, foreclosure.

(5) Carter, commissioner, to John W. Akin, August, 1904.

(6) Akin to Etowah Development Company, September 28, 1904.

(7) Etowah Development Company to Etowah Power Company, May 25, 1905.

(8) Granger to Etowah Power Company, May 25, 1908.

The Etowah Iron Company owned large tracts of land in Bartow county on the north side of the Etowah river, and owned and controlled at the time of the paper made by Abernathy to Granger, receiver, all the land on the river except this lot No. 424, and as to this they neither had the title nor the right to flood. The proceeding in which Granger was appointed receiver of the Etowah Iron Com-

pany was dismissed August 3, 1900, and Granger discharged as receiver. In the deed made from the Etowah Iron Company to the Blue Ridge Mining Company there was no mention of this land lot specifically by number, nor was there in the mortgage deed from the Blue Ridge Mining Company to the City Trust Company. The lot by number first appears in the deed made by Carter, commissioner, to John W. Akin. While there is, as stated, no specific reference to this lot by number in former deeds, it is urged that the following general words of conveyance are used which would include this right:

"Also any and all property heretofore belonging to the Etowah Manufacturing & Mining Company, and by it conveyed to Aaron Haas and others, and by them to Hill, Rankin and Haas, trustees, and by them and other parties to Etowah Iron & Manganese Company by conveyance recorded in the clerk's office of the superior court of Bartow county, Book AA of Deeds, page 565. Also all and singular the property, tools, cars and mining implements of every sort, roadbeds, rails, railroads, tramroads, rights of way, easements and privileges, of ingress and egress, over lands and others, corporate and incorporate hereditaments of every sort and kind owned by or due to party of the first part."

Subsequently it appears in the deed from Akin to Etowah Development Company and from the Etowah Development Company to the Etowah Power Company. This is not very material because the matter at issue here depends after all on the validity of the conveyance by Abernathy to Granger, receiver, on November 17, 1899, so far as the defendant's title is concerned.

The first thing for determination in the case when the argument was heard was the jurisdiction of the court. It was claimed that Albert Strickland and John T. Norris were interested with Tinsley in the property in controversy as part owner of the same, or at least having such a material interest therein that, as Strickland and Norris were citizens and residents of Georgia and this district, their interest in the subject-matter of the suit defeated the jurisdiction. It was also claimed that the jurisdictional amount was not involved.

Defendant has now withdrawn the defense of want of jurisdiction and waives the same. It was manifest all along that the latter claim—that is, the lack of jurisdictional amount—was not meritorious. The other need not now be considered, in view of the fact that defendant concedes the jurisdiction of the court and withdraws any defense to that effect.

This case really turns upon the validity and binding effect of the paper executed by Zephaniah Abernathy on November 17, 1899. The attack upon it is on two grounds: First, the lack of consideration; and, second, that it was made to a receiver without any authority from or ratification by the court. As to the consideration the deed recites, as has been seen, the consideration of $1 cash paid and $24 as soon as the privileges, rights, and estates conveyed shall be used by the receiver or his assigns. If the $1 cash was paid and the agreement was to pay the other $24 in a reasonable time, this paper would undoubtedly be good. The first contention with reference to the consideration is that the $1 was never really paid. There

is a great deal of evidence pro and con as to this. It seems that there was some land belonging to the Etowah Mining Company, adjoining land lot No. 424, which Abernathy had rented and was cultivating. How long Abernathy had this land rented does not clearly appear from the evidence, but it seems that he was to pay $1 per annum for time he had it. It seems also that he was indebted to the Etowah Iron Company for at least a year's rent and perhaps more. Abernathy had given a note for a year's rent, and J. J. Calhoun was the agent for Granger, receiver, and had been and was in control of the property in Granger's hands as receiver. He looked after the land and all matters connected with it. He made the trade with Abernathy and took the paper under which the defendant claims.

Calhoun says that as agent for Granger, receiver, he "had the power to lease all the farm lands, and to collect the rents for the same, and in a good many instances I had the power to make small leases for ore, for mining ore, and to collect the royalty paid them for the same."

He testifies that Granger was away a great portion of his time, and that he (Calhoun) had the authority to do what he thought was best in the interest of the property. He also says that as the agent for Granger, receiver, he did make the transaction with Abernathy acting for the receiver.

Mr. Calhoun says:

"Mr. Abernathy owned or claimed lot No. 424, and I knew if there was a dam ever erected on the Etowah river that there would be a small portion of that lot that would be overflowed by the dam. I told him so. I met him at his house. Him and his wife were both present, and I told him about it. I told him that I wanted to buy the right to raise the water as much on that lot as was necessary at any time for the Etowah Iron Company, and offered him $1 cash and $24 additional whenever they should commence the erection of the dam on the river. He agreed to it, saying that where the river could possibly overflow was very steep and hilly, and it wouldn't amount to much, and that he would willingly do it in order to get the work that would follow the erection of the dam there. I made that trade with him there, and he and his wife both agreed to it. I told him that I couldn't write the deed, but that I would bring it in to you (Judge John W. Akin), who was the attorney of the company, and that you would write the deed, and that some time when he came in to town he could sign it, and that was agreed to. I don't remember how long after that he did come in to town, but the first time I saw him I carried him to your office and told you— Before that, however, I gave you a memorandum of the trade with him, and you said that you would write out the deed and it could be executed any time. Mr. Abernathy came in, and I carried him to your office, and you had the deed typewritten, as well as I recollect, and we read the deed over to him. I know I read the deed to him, and he was satisfied with it."

Calhoun in his testimony further says that, referring to the consideration to be paid Abernathy:

"The agreement was that he was owing the company for the rent for a lot of land near the land he owned, and that I was to pay him a dollar out of that rent as soon as the deed was signed. * * * I think it was only a dollar or two that he paid, because he joined the lot and was trespassing on it, and I took the rent more to hold possession of the lot than

anything else. It was not the amount of the land that he worked or the value of the land, but simply to hold possession for the company. I think it was a nominal rental of $1 or $2 a year."

Calhoun further says that he had taken a printed rental note from Abernathy that was given by every man that rented land from the company, and that the rent was $1 or $2; he has forgotten what it was; but it was a small amount, and he says that:

"He didn't pay any cash, but that the amount was paid him out of the rent that was due. He was owing for several years."

There is some controversy in the evidence as to whether the note was actually delivered, because it appears that a note was afterwards found in the papers of the company. It seems reasonably clear from the evidence, however, that the agreement was that the note should be returned to Abernathy, if it was not actually returned.

Mr. Abernathy in his testimony acknowledges that he signed the paper upon which the defendants rely—that is, the writing above set out, executed by him to Granger, receiver—by making his mark thereto, Calhoun acting as agent for Granger. He calls it an "option."

In one part of his testimony Mr. Abernathy says this (page 38, pt. 1):

"Q. Capt. Calhoun was agent for the Etowah Iron Company, and Granger was receiver for Etowah Iron Company, and you rented this land from him as land agent of the company? A. I didn't particular rent it; there was just a little said. There was a little strip there near my house, and he told me he would charge me a dollar rent for it.

"Q. He was acting for the company? A. Yes.

"Q. The time he made the trade with you? A. Yes, sir.

"Q. You understood, didn't you, that the reason he wanted to get that lot, to develop the water power of Etowah Iron Company, all those shoals in connection with that lot, that the company was talking about selling it to let somebody develop it? A. They was talking about building a dam and wanted to buy it to get the water, what water would back up on it.

"Q. You understood it was for the benefit of Etowah Iron Company? A. That is what he said it was."

It is perfectly clear, therefore, from all the evidence, that the paper relied upon by the defendants was executed by Abernathy. Therefore, as to the contention that there was not sufficient consideration to support this contract between Abernathy and Granger, receiver, which has been earnestly urged and argued at length, this seems to me to be true: Taking all the testimony together, that Abernathy probably received the $1 by the delivery to him of his note, if not, that he received it by a perfectly valid agreement made by Calhoun to deliver him the note, to which he became thereby entitled.

[1] The payment of the $1 and the agreement to pay the additional $24 when work should be commenced on the river as contemplated constitute this a conveyance in my opinion and not an option. Of course, it was necessary for this agreement for the payment of the other $24 to be within a reasonable time. If it was not, Abernathy could have taken proper steps to have this $24 paid or have instituted proceedings to have the agreement rescinded. I do not think, however, that the time in which the amount of the purchase money was to be

paid and was actually tendered was unreasonable, or at least so unreasonable as to render the transaction void.

[2] Whether the $1 was paid or not, as it is recited in the instrument as having been paid, it constitutes sufficient consideration, and the instrument is valid so far as that feature is concerned, because it is an obligation which can be enforced.

In Southern Bell Telephone Company v. Harris, 117 Ga. 1001, 44 S. E. 885, the Supreme Court of Georgia settles the question as follows:

"Where a contract contains a recital of the payment of $1 as its consideration, the contract is valid, though the sum named was not actually paid. It creates an obligation to pay that sum, which can be enforced by the other party."

It is earnestly contended that Granger, as receiver, had no authority from the court under which he was acting to purchase this property, that he never reported the same to the court, and that there was no ratification of it.

The Etowah Iron Company, it appears, was placed in the hands of a receiver of the state court, the superior court of Bartow county, on petition of Granger and others who were controlling stockholders in that company. It remained in the hands of the receiver for some time, covering the period of the making of this paper by Abernathy to Granger, receiver, and the receivership was afterwards dissolved and the case dismissed; the property going back into the hands of Etowah Iron Company.

John W. Akin, who was attorney in the Etowah Iron Company receivership case, testifies as follows:

"I took a general order which is lost or mislaid and after due search cannot be found, in which plenary powers were given to the receiver authorizing him to do with and manage the property as he saw best without obtaining further authority from the court, and to make any trades concerning or with relation to the property or any leases, and practically to manage the property as an owner might. I took that order from the court in which the case was pending and carried it directly to my office. I do not remember ever returning it to the clerk's office or ever having it recorded. I had my office searched for it. After my illness I went over my old papers and burned up a lot that I thought would have no use for, and it may have been burned up among those."

[3] If the recollection of Judge Akin is correct, and such order was made, it would seem to relieve the case of all difficulty so far as the right of the receiver to act in this transaction is concerned. Whether it was or not, however, and even if it was a matter for the court here to consider in this collateral way, the transaction was sufficient to take the title to this water right out of Abernathy, and if it did he had no rights afterwards to convey the same; and any one taking a conveyance from him subsequently with notice of this transaction with Granger, receiver, would acquire no title thereby.

If we may gather the intent of the parties from the extraneous evidence, it seems clear that Abernathy knew that the rights he granted were to go to the Etowah Iron Company. He says so in his testimony. But it is perfectly clear otherwise that Calhoun obtained it for the Etowah Iron Company. He was acting for Granger, re-

ceiver for the Etowah Iron Company property; Granger himself being largely interested in the corporation.

It seems unnecessary to determine where the right went to erect dams and flood the land as named in the instrument; but, as I have stated, my conclusion is it went to the Etowah Iron Company, considering all the facts and circumstances of the case. If it went to Granger individually, and the words "as receiver" were simply descriptio personæ, then, as will be seen, Granger has conveyed it to the Etowah Power Company. It is conceded, as I understand it, that the Georgia Power Company has now acquired all the rights of the Etowah Power Company.

The following extract from Thompson v. Phenix Ins. Co., 136 U. S. 287, 10 Sup. Ct. 1019, 34 L. Ed. 408, is strong authority supporting the right of the receiver to do what he did in this case in view of all circumstances and the existing situation:

"The first contention of the company is that the receiver, Kearney, had no authority, without special instructions from the court, to incur expenses or liability for insurance premiums. In support of this proposition, its counsel cites Cowdrey, etc., v. Galveston, etc., Railroad Co., 93 U. S. 352 [23 L. Ed. 950], where one of the questions was whether a receiver of a railroad company should be allowed for expenditures made by him, without the previous sanction of the court, in defeating a proposed municipal subsidy in aid of the construction of a railroad parallel with the one in his hands. It was held that such expenses were properly disallowed, although the proposed road, if constructed, might have diminished the future earnings of the one in his charge. This court said that to permit a receiver to determine questions of that character, and, upon such determination appropriate funds in his custody, would sanction a principle that would open the door to all sorts of abuses. It added that 'a receiver is not authorized, without the previous direction of the court, to incur any expenses on account of property in his hands beyond what is absolutely essential to its preservation and use, as contemplated by his appointment.' Of the soundness of this general principle no doubt can exist, though difficulty may sometimes arise in its application to particular cases. Due regard must always be had not only to the nature and surroundings of the property in the custody of the receiver, but to the exigencies of the moment when he may be required to take action involving the safety of property in his charge. We do not doubt that under some circumstances a receiver would be derelict in duty, if he did not cause property in his hands to be insured against fire. The case last cited is authority for the principle that, without the previous sanction of the court, a receiver may incur expenses that are absolutely essential for the preservation of the property in his custody. But if this were not so, and if, without the previous order of the court, he applies funds in his hands for such a purpose, the contract of insurance will not, for that reason, be void, as between him and the insurance company. It appears from the policy that the company was informed as to the capacity in which Kearney acted, namely 'as receiver for Holladay & Holladay.' According to the amended bill, it knew the precise nature and extent of the interest represented by him, and that he had no personal interest in the property insured. If the court, whose officer he was, had directed him to procure insurance, the present objection could not be urged with the slightest expectation of its being sustained. And yet, whether Kearney exceeded his authority, or rightly applied the funds in his hands, are questions in which no one is concerned, except himself, the court to which he was amenable, and the parties interested in the property in his charge. If he was not, technically, authorized to use the funds in his hands to pay for insurance, still, upon the settlement of his accounts, if he acted in good faith, the court might allow him any sums paid out for that purpose. He held such relations to, and was under such personal responsi-

197 F.—39

bility for, the safety of the property, that he could make a valid contract of insurance, although his use of the funds in his hands for that purpose was subject to the approval of the court. In Tempest v. Ord, 2 Merivale, 55, Lord Chancellor Eldon said that: 'Formerly; the court never permitted a receiver to lay out money without a previous order of court. But now, where the receiver had laid out money without such previous order, it was usual to refer it to the master to see if the transaction was beneficial to the parties; and if found so, the receiver was allowed the money so laid out.' Upon this point, Brown v. Hazelhurst, 54 Md. 26, 28, is instructive. In that case, objections were made to allowing a receiver for sums paid by him, without the previous sanction of the court, for insurance. The court said: 'There is no doubt of the general rule, and it is a wholesome one, that a receiver will not be permitted to lay out more than a small sum at his own discretion, in the preservation or improvement of the property under his charge; but he should, in all cases where it is practicable, or the circumstances of the case will permit, before involving the estate in expenses, apply to the court for authority for so doing. But this general rule, however salutary it may be, should not be rigidly and sternly enforced as to work wrong and injustice, where the receiver has acted in good faith,. and under such circumstances as will enable the court to see that, if previous authority had been applied for, it would have been granted. The justice and right of the matter must depend, to a great extent, upon the special circumstances. of each case that may be presented.' "

[4] Assuming that Abernathy had parted with this right and could not for that reason subsequently convey it legally to Strickland, it cannot be denied that Strickland had actual knowledge when he took the first conveyance from Abernathy or when he took the deed from Josie Abernathy. While not so clear, I think it reasonably clear from all the evidence that when Tinsley bought from Strickland he took with actual knowledge of the existence of the paper from Abernathy to Granger, receiver. If there were nothing else to evidence this, it is clearly shown to my mind by the character of the warranty Tinsley took from Strickland. While the deed from Strickland to Tinsley is dated May 20, 1905, it was understood that it was executed the latter part of September or early in October, and contemporaneously or about the same time that a separate warranty from Strickland to Tinsley was executed. The writing containing such warranty as there was is as follows:

"October 7, 1905. In consideration of the fact that T. G. Tinsley, of Nashville, Tenn., has purchased lot of land 424 in the twenty-first district and second section of Bartow county, Georgia, for the sum of $660.00, and I have given him a quit claim deed to same and the Etowah Power Company claims a right of backing water on said lot of land: Now, therefore, in consideration of the premises, I hereby warrant to said T. G. Tinsley and his heirs, but not his assigns, title to said property and to water power on and over the same, and to backwater privileges on said lot, free from the claims or the rights of said Etowah Power Company or any other person whatsoever. It is the intention of this warranty to protect said T. G. Tinsley in his sole and undivided ownership, use and possession of the aforesaid lot and the water rights and privileges thereto to the extent aforesaid $660.00 and any costs or attorney's fees which said Tinsley may reasonably expend in defending this title to said land and to the water power and privileges on and over the same. It is not the intention of this warranty to protect any assigns of the said T. G. Tinsley or any transferee in said rights and privileges.

"Witness my hand and seal the day and year above written.

                                              "A. Strickland. [Seal.]"

. The deed from Strickland to Tinsley was recorded October 9, 1905, and seems to have been executed about the time it was filed for record and recorded, although dated back to May 20th.

So it appears that Tinsley was looking for a lawsuit, and this claim of the Etowah Power Company based on the conveyance from Abernathy to Granger, receiver of the Etowah Iron Company, was the only source from which they could have anticipated a lawsuit so far as this evidence discloses.

In addition to this, Tinsley in his own testimony, in answer to the fourteenth interrogatory, says:

"The only explanation I have for the purchase of the lot was that I owned an interest in it, and in view of the litigation which was imminent, Mr. Strickland consented to sell out, and if he had any other reason or motive that prompted him in doing so, I am not aware."

As the only litigation Tinsley could have been expecting was with the holder of this conveyance from Abernathy to Granger, receiver, his statement above seems further proof of his knowledge of the existence of that conveyance.

It is immaterial therefore, as I have stated, whether the instrument executed by Abernathy to Granger, receiver, was properly attested for record or not.

Many interesting questions have been raised in connection with this case and ably discussed in oral argument and in briefs furnished by counsel for both sides. I do not consider it necessary, however, to go into the case more fully than has been done. The real matters for determination in the case are:

(1) The validity of the paper executed by Abernathy to Granger, receiver, as a conveyance of the water rights in question here.

(2) Did Tinsley buy with knowledge actual or constructive of the existence of this conveyance to Granger, receiver?

My conclusion is that the writing signed with his mark and delivered by Abernathy to Granger was a valid conveyance of the water rights as stated therein, and that Tinsley took with actual notice that this paper had been executed and was outstanding, so it is immaterial whether the paper was so executed as to make it a record instrument and constructive notice or not.

The prayer, therefore, that this conveyance from Abernathy to Granger, receiver, be decreed invalid and a cloud upon complainant's title, must be denied, and as a consequence of this the bill must be dismissed, with costs, and a decree may be taken to that effect.